

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

LILLIE BOOZE KITTLING

-vs-

CENTENNIAL BEAUREGARD CELLULAR

CIVIL ACTION NO. 1:08-cv-1482

JUDGE DRELL

MAGISTRATE JUDGE KIRK

## RULING

Before us is a motion for summary judgment (Doc. 27) by Defendant Centennial Beauregard Cellular LLC d/b/a Centennial Wireless ("Centennial" or "Defendant"). We GRANT the motion and ORDER that the claims of Plaintiff Lillie D. Booze Kittling ("Kittling" or "Plaintiff") be dismissed with prejudice.

## SUMMARY

We provide a detailed analysis below, but as the facts are involved and this ruling lengthy, we find it worthwhile here to reiterate the core of our reasoning. Plaintiff was a newly hired employee who missed 15 days of work in her 90 day orientation period, while her employment contract only allowed her to miss two days. Defendant did not fire her when she returned to work, but it informed her that further absences would be unacceptable. Plaintiff began to miss additional days of work two weeks later, and Defendant fired her.

Because Defendant did not fire her immediately after her earlier absences and because all but one of her absences was for medical reasons, Plaintiff now claims that she was "terminated for missing one (1) unexcused medical absence," essentially for missing a single day of work. (Doc. 31, p. 14). Though we find that even this likely would have been justified under Defendant's stated

employment policy, we reject Plaintiff's position because we find that her framing grossly mischaracterizes Defendant's action.  Simply because Defendant did not immediately fire Plaintiff after her first absences and instead gave her a second chance does not mean that those absences were somehow waived for considering whether to retain Plaintiff in the immediate future.  Likewise, that Plaintiff had a "doctor's excuse" for many of her absences does not prevent Defendant from choosing to fire Plaintiff for them when Plaintiff had no legal right to medical leave.[1]  This is particularly so when there is absolutely no evidence that Plaintiff suffered disparate treatment, or that Defendant's conduct was otherwise racially discriminatory.  Consequently, we find that Plaintiff does not meet her burden of proving a prima facie case of discrimination, and even if she would, that Defendant had a more than adequate non-discriminatory and non-pretextual reason for firing her.

## BACKGROUND

On or about August 14, 2007, Defendant hired Plaintiff, an African-American, to work as an inside sales representative (ISR) in its retail store in Pineville, Louisiana.  Plaintiff would sell Centennial's wireless phones and services plans to potential and existing Centennial retail customers. She would work on the "floor" of the shop, on which were various workstations with computers that employees could use to process transactions.

The hiring decision was apparently made by the store's supervisor Angela Luneau ("Luneau"), in consultation with her own bosses and Defendant's HR representatives.  Plaintiff was given all appropriate employee documentation upon hiring, including an employee handbook explaining, as discussed in detail below, that new ISRs are hired under a 90 day orientation period

---

[1]  As she was so recently hired, Plaintiff was not entitled to any type of federally mandated leave.

-2-

and Defendant's "Time Away From Work" or absentee policy.  (Doc. 27-3, pp. 19-26).

Plaintiff's orientation lasted from August 14, 2007 to November 11, 2007.  It was not an ideal period, in either party's eyes.  Plaintiff complains that she received poor treatment in various ways, as discussed further below.  Defendant complains that Plaintiff almost immediately began to miss work, including 15 absences in this period comprised of August 30, September 1, 25, 26, October 27, 29, 30, 31, and November 1, 2, 5-9.  (Doc. 27-1, p. 4, citing Doc. 27-3, pp. 27-28).

It appears undisputed that Plaintiff completed her orientation when she "was off of work from October 22, 2007 to November 12, 2007 because of [a] medical emergency and surgery. [She] returned to work on November 13, 2007 although her doctors had indicated she should delay her return."  (Doc. 31, p. 6).

About two weeks after returning to work, on Sunday, November 25, 2007, Plaintiff apparently came down with an infection related to her surgery, causing her to miss that workday. She apparently offered to go in the next day – November 26, when she was not otherwise scheduled to work – to make up for her absence, but she missed that day as well.  She was already scheduled to work November 27, but she had her mother, on her behalf, call Luneau that day to inform her that she would not be able to come in.  Plaintiff was also scheduled to work the next day, November 28, but that afternoon – when she had been scheduled to begin work that morning – she called to say she again could not make it.  During that phone call she was terminated.

Thereafter, Plaintiff requested a reconsideration of her termination from Centennial's central office on the grounds that it was unfair to fire her due to medical issues.  (Doc. 31-4, pp. 27-28). Centennial's VP of Human Resources Patricia Slocum ("Slocum") began a review process, during which Plaintiff informed Slocum that she would have a six week recovery period from her

-3-

November 9 surgery which would cause her to miss work until December 17, almost three weeks away. (Doc. 31, p. 6; Doc. 31-4, p. 41). Still, though it was under no legal obligation to do so, Defendant expressed a willingness to rescind Plaintiff's termination if she could provide documentation that all of her absences were for medical reasons. Plaintiff failed to produce this documentation, because, the record here reveals, such documentation does not exist. (Doc. 31-4, p. 46; Doc. 31-6, p. 10). Plaintiff then voluntarily ceased communication with Defendant before it had resolved the issue or made a final determination as to whether to reverse its decision. (Doc. 31-4, pp. 19, 82).

Plaintiff subsequently filed an unsuccessful complaint with the Equal Employment Opportunity Commission (EEOC). She then timely filed this action, claiming "that defendant terminated her . . . from her employment on the basis of her race (African-American) in violation of Title VII of the Civil Rights Act of 1964." (Doc. 31, p. 5).[2] After extensive discovery, Defendant filed this motion for summary judgment to dismiss all of Plaintiff's claims.

<u>LEGAL STANDARD</u>

**I. Summary Judgment**

Under Rule 56, the Court will grant a party's motion for summary judgment only if:

> the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law . . . support[ing] the assertion by citing to particular parts of materials in the record.

Fed. R. Civ. P. 56. "'Material facts' are those facts 'that might affect the outcome of the suit under the governing law.'" *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998) (quoting *Anderson v.*

---

[2] Plaintiff also initially stated a claim under the American with Disabilities Act. This claim was abandoned after discovery revealed it to be without merit. (Doc. 31, p. 5, fn. 1).

*Liberty Lobby, Inc.* 477 U.S. 242, 248 [1986]).  The facts are reviewed with all "justifiable inferences" drawn in favor of the party opposing the motion.  See *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255).  However, factual controversies are resolved in favor of the non-movant "only when there is an actual controversy–that is, when both parties have submitted evidence of contradictory facts." *Laughlin v. Olszewski*, 102 F.3d 190, 193 (5th Cir. 1996).

Once the movant shows there are no genuine issues of material fact, the burden is on the nonmovant to demonstrate with "significant probative evidence" that there is an issue of material fact warranting a trial.  *Texas Manufactured Housing Ass'n v. Nederland*, 101 F.3d 1095, 1099 (5th Cir. 1996), cert. denied, 521 U.S. 1112 (1997).  A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  See *Anderson*, 477 U.S. at 249-50.  Mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient to defeat a motion for summary judgment.  *Brock v. Chevron U.S.A., Inc.*, 976 F.2d 969, 970 (5th Cir. 1992).

## II. Title VII Employment Discrimination

"Plaintiff has no direct evidence of unlawful discrimination" and instead claims based only on circumstantial evidence. (Doc. 31, p. 18).  On summary judgment, claims of racial discrimination based only on circumstantial evidence are evaluated under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973); *Price v. Federal Express Corp.*, 283 F.3d 715, 719-20 (5th Cir. 2002).

Under the *McDonnell Douglas* framework, the plaintiff first must establish a prima facie case

of discrimination.[3] See *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). A prima facie case of discrimination requires the plaintiff to show that: (1) she is a member of a protected group; (2) she was qualified for the position at issue; (3) she was discharged or suffered some adverse employment action by the employer; and (4) she was replaced by someone who is not a member of her protected group or she was treated less favorably than others similarly situated to her. *Byers v. Dallas Morning News*, 209 F.3d 419, 426 (5th Cir. 2000).

If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action. See *Russell*, 235 F.3d at 222. The employer's burden is only one of production, not persuasion, and involves no credibility assessments. *Russell*, 235 F.3d at 222 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 [1981]).

If the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose. See *id.* To carry this burden, the plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 [5th Cir. 2001], cert. denied, 535 U.S. 1078 [2002]). A plaintiff may establish pretext "by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 [ 2000]). An explanation is false or unworthy of credence if it is not the real reason for the employment action. *Id.* "Evidence demonstrating that

---

[3] Much of the discussion below is adapted from *Staten v. New Palace Casino*, 187 Fed.Appx. 350, 357-58 (5th Cir. 2006).

the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination . . . even without further evidence of the defendant's true motive." *Id.* "No further evidence of discriminatory animus is required [for a claim to survive summary judgment] because 'once the employer's justification has been eliminated, discrimination . . . may well be the most likely alternative explanation.'" *Id.* (quoting *Reeves*, 530 U.S. at 147).

ANALYSIS

We find that summary judgment is warranted both because Plaintiff fails to make a prima facie case of discrimination, and because Defendant provides a reason for its action that Plaintiff can neither rebut nor show is unworthy of credence.

Importantly, the employment action in dispute is Plaintiff's termination. She also alleges that she suffered discrimination in other ways earlier in her employment tenure. Some of these allegations are of the classic he-said she-said variety and thus incapable of resolution on summary judgment. However, while these allegations present disputed issues of fact, they are ultimately immaterial, because Plaintiff does not show that these other allegations were motivated by or are indiciative of racial animus so as to render Defendant's proffered explanation unworthy of credence, nor that they are otherwise related to her termination in a way that could sustain a Title VII claim.

## I. Plaintiff fails to make a *prima facie* case of discrimination

As discussed, a prima facie case of discrimination requires the plaintiff to show that: (1) she is a member of a protected group; (2) she was qualified for the position at issue; (3) she was discharged or suffered some adverse employment action by the employer; and (4) she was replaced by someone who is not a member of her protected group or she was treated less favorably than others

similarly situated to her. *Byers*, 209 F.3d at 426.

The first three of these elements are not at issue here, as Plaintiff (1) is African-American and thus a member of a protected group, (2) was hired and otherwise qualified for the position at issue, and (3) was discharged by Defendant, her employer. However, with regard to the fourth element, Defendant contends that Plaintiff was not "replaced by someone who is not a member of her protected group [nor] treated less favorably than others similarly situated to her." We agree.

Plaintiff can satisfy this element in one of two ways, both of which Defendant challenges. For one, Plaintiff could show that she was "replaced by someone who is not a member of her protected group." However, since terminating Plaintiff Defendant's hiring of African-Americans for ISR positions at its Pineville store, has increased, not decreased. Whereas Plaintiff was the only African-American ISR at that store when she was hired – and one of only two African-American employees total – today three of Defendant's fifteen ISRs are African-American. There is a pool of ISRs, so it may not be possible to identity Plaintiff's individual replacement, and we are not provided any details of the race of the next one or two ISRs hired immediately following Plaintiff's termination. However, Plaintiff bears the burden of production on this point, and Defendant's subsequent practices – with Plaintiff's inability to point to any evidence supporting its own position – at least call Plaintiff's claim into question, if not outright refute it.

Next, Plaintiff could show that she was "treated less favorably than others similarly situated to her." Defendant challenges Plaintiff on this point by presenting evidence that other, Caucasian employees were terminated for missing fewer days during their probationary period than did Plaintiff. (Doc. 27-2, p. 17) (discussing the termination of a Caucasian employee after only four absences during the probationary period, while Plaintiff incurred 15). In addition, it points out that

-8-

Plaintiff again presents no evidence to the contrary, to show that any employee who ever missed such a significant period of work – much less so early in their tenure – was not terminated.

Instead, Plaintiff attempts to circumvent this requirement by claiming that she was fired for "one unexcused absence" following her orientation period, which she claims violated Defendant's stated employment policy. She still presents no evidence of disparate treatment in this regard – that Defendant ever failed to fire any other employee who incurred "only one unexcused absence" the month immediately following his or her probationary period – and, as discussed below, we doubt that doing so would actually violate Defendant's employment policy. Regardless, though, we reject Plaintiff's assertion because we find that Plaintiff's description profoundly mischaracterizes how Plaintiff was "situated" and thus to whom she should be "similarly" compared. Plaintiff had already missed fifteen days of work in her orientation period when, following this period, she began to miss multiple additional days due to a recurrence of her illness. For purposes of disparate treatment analysis, she therefore should not be compared to other employees who missed only a single day; rather, she should be compared to other employees who have incurred a significant number of absences. After extensive discovery, including depositions of multiple Centennial HR executives, Plaintiff cannot point to any evidence that Defendant ever permitted another employee to miss any significant period of work for any reason, that it had a policy of excusing other employees' illness-related absences, that it did not fire other employees who missed multiple days of work due to illness, or that it otherwise ever made any type of allowance for any other employee that it did not also make for Plaintiff.

Accordingly, as Plaintiff presents no evidence either that she was replaced by someone not of the protected class, or that she suffered from disparate treatment, we agree with Defendant that

Plaintiff fails to sustain her burden of making a prima facie case of racial discrimination.

**II. Defendant presents a legitimate and nondiscriminatory reason for its action that Plaintiff cannot show is pretextual and / or false or unworthy of credence**

Though we do not find that Plaintiff makes a *prima facie* showing of discrimination, we analyze the remainder of the *McDonnell Douglas* test as if she had.

Here, Defendant meets its burden of production by claiming to have terminated Plaintiff's employment because of excessive absences.  In particular, it claims that Plaintiff missed 15 days of work during her 90 day probationary period, then began to miss additional days after that period ended, at which point she was terminated.  Defendant's production of such a non-discriminatory explanation satisfies its burden and causes the test to shift back to Plaintiff, who must show that Defendant's proffered reason is pretextual, for instance, because it is false or unworthy of credence.

**A. Defendant's employment policy provide no basis for finding its reason pretextual**

First, and the assertion that constitutes the bulk of Plaintiff's argument, she contends that her termination was pretextual because it was not in accordance with Defendant's stated employment policy.  We disagree, and indeed we find that Plaintiff's interpretation so misstates this policy as to constitute a willful distortion of it.

Defendant's employment policy regarding absences was set forth in two documents provided to Plaintiff at the time of her hiring.  For one, the Centennial Associate Handbook ("the Handbook") detailed Defendant's general "Attendance and Lateness" and "Sick Leave" policies. (Doc. 27-3, pp. 19 *et seq*).  The former provided, in pertinent part:

> Any absence for which you do not have preapproval from your manager is considered unscheduled.  If you cannot give advance notice because you are sick or have an emergency, you should contact your manager . . . within a half hour of your regularly

-10-

scheduled start time. You should also let your manager know when you expect to return to work.

Because unscheduled absences are disruptive . . . they can negatively affect your attendance record and are considered in assessing your overall job performance.

Please note that excessive absenteeism and / or tardiness, may result in disciplinary action up to and including termination.

The "Sick Leave" policy, meanwhile, stated in relevant part:

Centennial provides a sick leave policy . . . Your eligibility for sick pay begins after completion of your 90-day orientation period. Thereafter, *new associates accrue one-half (½) paid sick day for each full month worked during the first calendar year of employment.*

Regular . . . associates . . . who have completed their first calendar year of employment are eligible for up to seven (7) sick days at the start of each calendar year. . . .

Any sick day taken before the completion of your orientation period or in excess of seven days during a single calendar year will be unpaid. Excessive use of sick days may result in disciplinary action up to and including termination. See your manager or local attendance policy for more details.

(Doc. 27-3, p. 23) (emphasis added).

For two, this portion of the policy from the Handbook was supplemented and detailed in

Defendant's "Addendum to Attendance Policy for Non-Exempt Associates." (Doc. 27-3, pp. 24-26).

It described an addition to the "call in procedure" – providing that "failure to call in for an entire

workday will be considered as your voluntary resignation," (Doc. 27-3, p. 24), – and, more

importantly, it further articulated Centennial's policy for "Absences After Completion of the

Orientation Period." It stated, in relevant part:

1) Absences EXCLUDED in the Attendance Policy are as follows: personal days, vacation, bereavement, jury duty, holidays, approved leaves of absence both personal and medical, work related injuries, and Family Medical Leave. Absences INCLUDED in the Attendance Policy are sick days, tardies, and leave earlier.

-11-

2) Excessive absenteeism is defined as any absence in excess of 7 days from January 1 through December 31st excluding those absences listed above.  On January 1, each associate who has not reached a warning level will start over again. . . .

3) Excessive absenteeism will be handled as follows:

Day 8 – Verbal Warning and counseling session
Day 9 – Written Warning and counseling session
Day 10 – Working Suspension (2 Days)
Day 11 – Termination
. . .
The disciplinary steps outlined above are a guideline and do not exclude management's right to bypass disciplinary steps should the circumstances warrant it.

(Doc. 27-3, pp. 24-25).

Plaintiff argues from these provisions that all of Plaintiff's absences except one should be considered "excused" because she can provide documentation that they were incurred due to illness. Then, she argues, these policies provided her with seven days of absences subsequent to her orientation period.  Accordingly, she claims that it was improper for Defendant to fire her for what she characterizes as her single unexcused absence.

We disagree with this interpretation of Defendant's policies, for two reasons.  First, and most simply, it does not provide that sick days are "excluded," the term used in the policy, or "excused," the term used by Plaintiff.  Plaintiff continually and repeatedly references this concept – that if an absence was due to medical illness, it was automatically "approved" or "excused" and therefore should not count against her – but Defendant's policy says no such thing.  To the contrary, it plainly provides that the only "excluded" medical absences are those for Family Medical Leave and which it voluntarily approves, and that "[a]bsences INCLUDED in the Attendance Policy are sick days." There is absolutely no basis in these provisions for concluding that Defendant had a policy of permitting its employees to miss indefinite amounts of work if their absence was due to sickness,

-12-

particularly during the initial days of employment, and Plaintiff can point to no evidence that it had such a policy de facto.  Accordingly, we find that nothing shows Defendant's explanation of firing Plaintiff for excessive absenteeism – for taking several weeks of sick days to which she was not entitled – was pretextual.

Second, and again contrary to Plaintiff's assertions, Plaintiff was not entitled under the policy to seven sick days of absences at the end of her orientation period.  Plaintiff makes this claim based on point 2 of the Addendum above, which defines "[e]xcessive absenteeism" as "any absence in excess of 7 days from January 1 through December 31st excluding those absences listed above." This Addendum, however, supplements and clarifies Defendant's general attendance policy, also quoted above.  This policy clearly provides that employees only accrue sick days at the value of one half (½) day "for each full month worked during the first calendar year of employment," and only "are eligible for up to seven (7) sick days at the start of each calendar year" after they "have completed their first calendar year of employment."  Plaintiff was thus not entitled to any sick days immediately following her orientation period, on November 11, 2007, and was scheduled to accrue them thereafter at the rate of ½ day per month worked until the start of the next calendar year.

Meanwhile, as stated, in addition to her 15 absences in her 90 day orientation period, Plaintiff missed multiple days of work that November after completing her orientation period.  These absences thus occurred before she had accrued even one half of a sick day, much less the multiple days she missed.  They thus provide ample cause under the policy for Plaintiff's termination, even had she not missed any work during her orientation period.  In this regard, she had not earned even the time for the single unexcused absence that she acknowledges, so even terminating her only on that basis would have been justified under Defendant's employment policy.

-13-

In all, contrary to Plaintiff's assertions, Defendant's decision to terminate Plaintiff was squarely in line with its stated employment policy, and that policy provides no basis for concluding that Defendant's stated reason for terminating Plaintiff was pretextual, or is unworthy of credence.

### B. Pretext cannot be shown from any other conduct by Defendant

The other basis by which Plaintiff attempts to show that her termination was pretextual is her alleged treatment earlier in her employment.

In general, prior evidence of racial discrimination must be related to an employee's termination to support a claim for discriminatory termination. See *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir.1996).  On the other hand, even if not so related, when viewed in the light most favorable to the nonmovant evidence of prior discrimination can provide circumstantial evidence that an employer's later decisions were motivated by racial animus, making its proffered explanation unworthy of credence and raising a jury question as to the true reason for its action.  See *Russell*, 235 F.3d at 225-26 (discussing *Reeves*, 530 U.S. at 151).  We do not find that Plaintiff's allegations raise a jury question here, for the reasons given below.  We evaluate the treatment itself in Part 1, then the three reasons we find it incapable of showing that Defendant's proffered explanation is false or unworthy of credence in Parts 2, 3, and 4.

### 1. Plaintiff's earlier treatment

Plaintiff alleges that she was discriminated against earlier in her tenure by:

- not receiving the training that other employees received;

- having personal effects that she would leave at a work station placed on the floor;

- Luneau not giving her the security codes to open the store and disarm the alarm;

- not having her direct deposit form processed;

-14-

- hearing Luneau tell another employee that "she had to hire" plaintiff, because "you know why";

- her co-workers not acknowledging her, "no one was talking to her, didn't say hello, it was like she was invisible";

- hearing her co-workers talk about her, including one say she was "sick lying" or something similar;

- having a co-worker ask the manager to clean the bathroom after Plaintiff used it; and

- not being invited to office get-togethers.

We deal with each of these instances in turn.  First, the parties disagree as to whether Plaintiff received the same training as the other new employees.  Formally, new hires were ordinarily given two weeks of on-line orientation and then two weeks of classroom training.  There is no dispute that Plaintiff received both of these.  Less formally, new hires were assigned to "shadow" a tenured associate, who was then, once the new hires were on their own, supposed to "shadow" them in return "to see that they were comfortable with their job."  (Doc. 31-5, p. 37).

Plaintiff alleges that other employees were "being shown and given hands-on experience" by both Luneau and the associate(s) they were assigned to shadow, as well as by "other [experienced] reps in the store."  She also claims that a co-worker she was observing allegedly told her "she was not the one to train [her], and she had no time for new hires," (Doc. 31-2, pp. 69-70), and / or that it was "not her job" to train Plaintiff.  (Doc. 31-5, p. 38).  Defendant denies Plaintiff's allegations.  And Luneau specifically claims that Plaintiff never reported the incident with the co-worker to her.  (Doc. 31-5, p. 38).  To the contrary, Luneau claims that the employee Plaintiff was assigned to shadow complained herself that she was "discouraged, because at times [Plaintiff] would not take

-15-

notes, and [she] felt like she was repeating the same procedures to her." (Doc. 31-5, p. 37). Defendant therefore claims that Plaintiff received all training to which she was entitled, that Luneau never discriminated against her, and that any informal training she may have failed to receive from her co-workers was due to Plaintiff not being assertive or proactive in seeking such training.

This is obviously a factual dispute that we are unable to resolve. We note here only that Plaintiff never clarifies whether the employee(s) who refused to train her were those assigned to her. This is important because, while it may be unusual for an employee not to receive the usual training, different employees commonly receive different levels of informal training and assistance from their colleagues, including for the reasons articulated by Luneau. The former instance, if proven true, would at least provokes questions, while the latter is less likely to be probative of discrimination.

Second, Plaintiff alleges that various personal items she brought to work were misplaced, and specifically that in one instance she returned from a break to find that a co-worker had moved or was moving the personal effects she had left at a workstation onto the floor. (Doc. 31-2, pp. 73-74). Defendant claims this occurred because one of Plaintiff's co-workers needed to use the workstation where Plaintiff had left her things. (Doc. 31-5, p. 38). Plaintiff alleges she complained to Luneau about it at the time; Luneau allegedly told her to move her things to the other side of the room and to use the workstation there if she needed a computer. (Doc. 31-2, pp. 74-75). Defendant also claims, and it is undisputed by Plaintiff, that other Caucasian employees had their personal items similarly moved when another employee needed to use a workstation, though it is unclear if in these instances the effects were moved to the floor or merely under the desk or the top of the computer tower. (Doc. 31-5, p. 39).

Third, Plaintiff alleges she was not given the code to disarm the store alarm. (Doc. 31-2, pp.

-16-

31-32). Instead, on the "more than once" occasion when she was working the first shift and had to open the store, she had to call Luneau and get a temporary alarm code. (Doc. 31-2, p. 31). She claims that her (Caucasian) co-workers received such codes. *Id*. For Defendant, Luneau recalls "one time that [Plaintiff] had to call" her to receive such a temporary code, but otherwise claims not to have been aware that she had not received the codes. (Doc. 31-5, p. 40). In addition, Defendant rejects the more generalized implication that Plaintiff was not trusted with this information on account of her race, pointing out that Plaintiff had passwords and codes for other sensitive parts of the store, including the cash register and safe.

Fourth, Plaintiff alleges that Defendant delayed in processing her direct deposit form. Defendant admits this point, with Luneau saying she had inadvertently misplaced the form. It is undisputed that Plaintiff never missed a paycheck, receiving physical checks in lieu of the direct deposit for the time until her form was processed.

Fifth, Plaintiff alleges she overheard on one occasion, when her manager was asked by another employee "Why did you hire her," her manager respond, "Well, I had to. You know why." (Doc. 31-2, p. 67). Plaintiff says that "at that moment, I felt horrible. I felt like she hired me because she had to hire me, not based on my skills, but they were using my race to possibly – I don't know what her motive was, possibly to run me off." (Doc. 31-2, p. 67). Defendant denies this allegation. Luneau does not appear to have been specifically asked about this incident in her deposition, though she was asked and generally denied ever making any type of racially derogatory remark to or about Plaintiff.

As above, this is obviously a factual dispute that we cannot resolve. Here, we note only that it is not clear to us what inference this conduct is supposed to support. Even assuming its veracity

and interpreting it in the light most favorable to Plaintiff, it only shows that Luneau was aware of Plaintiff's race when she hired her and felt obliged to accord her some measure of special treatment because of it. Certainly it does not imply that Defendant would fire Plaintiff if her employment were a success. More generously, Plaintiff would seem to say that it implies that Luneau only hired her under a feeling of duress and so was looking to "run [her] off" from the moment she began working there. However, we find this to be an unreasonable inference to draw, considering that the quote directly expresses Defendant's awareness of Plaintiff's race and that it could be in some type of trouble if it treated her poorly because of it.

We discuss the above instances in detail because they all involve, at least in some way, Luneau, the store manager who hired and fired Plaintiff, though both decisions were also approved by Luneau's own bosses and Defendant's HR representatives. They could therefore at least plausibly be related to Plaintiff's termination – even if there is no direct evidence of such a link – as evidence of Luneau's racial animus, which, if proved, would make Defendant's proffered explanation for firing Plaintiff unworthy of credence. The remainder of Plaintiff's allegations, however – that she was not liked and was otherwise ignored by her co-workers; that she overheard her co-workers talking about her, including one say that she was "sick lying"; and that a co-worker asked the manager to clean the bathroom after she used it[4] – are too remote from the employment decision contested here to warrant detailed discussion. They all involve Plaintiff's interactions with her co-workers rather than management, and indeed in most of the instances Plaintiff does not even claim

---

[4] On Plaintiff not being talked to, see Doc. 31-2, p. 60 *et seq*; on her overhearing co-workers talking, including about the incident in Jena and a co-worker saying she was "sick lying" see Doc. 31-2, p. 72 and Doc. 31-5, p. 50; on the alleged bathroom comment, see Doc. 31-2, pp. 66-8; on her allegedly not being invited to an informal holiday party organized by her co-workers, see Doc. 31-2, pp. 60-61.

that she reported the incident. These claims, therefore, even if true, are not probative of Defendant's motivation for terminating Plaintiff, and thus they could not show that Defendant's proffered motivation is false or unworthy of credence.

Regarding the interactions discussed in detail above with which management was involved, taken as a whole, we find that they are woefully insufficient for such a showing, for the reasons given below.

### 2. *The same hirer, same firer presumption*

First, even if such treatment alone would be sufficient to infer a showing of falsity or pretext, such an inference would be inappropriate here as a matter of law due to the so called same-hirer, same-firer presumption. This presumption states that if the "same actor hires and fires an employee, an inference that discrimination was not the employer's motive in terminating the employee is created." *Faruki v. Parsons S.I.P.*, Inc., 123 F.3d 315, 320 n. 3 (5th Cir. 1997). This inference can buttress a conclusion that a Defendant's proffered reasons are [not] pretextual, including where an employee offers only evidence of alleged disparate treatment without any evidence that the disparate treatment was due to the employer's discriminatory animus. See *Id.*, at fn. 4.

Here, Luneau, the Pineville store manager and Plaintiff's supervisor, made the decisions both to hire and to fire Plaintiff. Accordingly, we find that this presumption applies here, and serves to reinforce Defendant's proffered explanation against Plaintiff's other allegations of discrimination.

In addition, we note that the reasoning behind the presumption applies perfectly to this case. Specifically, it would be illogical to infer from otherwise racially neutral evidence that a person who had chosen to hire an employee knowing of her race would then choose to fire her because of it. Here, Luneau personally interviewed Plaintiff – during which time she obviously could discern her

-19-

race and was told of Plaintiff's status as a breast cancer survivor – and chose to hire her.  Then, according to Plaintiff, she began to discriminate against her because of her race and status as a breast cancer survivor almost immediately, ultimately firing her for that reason and not because Plaintiff had missed several weeks of work in a short period of time.  This is not impossible.  However, we agree with prevailing Fifth Circuit jurisprudence that it does not present a question of fact when, as here, Plaintiff can present no evidence or explanation as to why it would occur, much less for why it shows that Defendant's otherwise imminently reasonable proffered reason for her termination has been refuted.

   *3.   There is no evidence that any of this treatment was related to Defendant's race*

Plaintiff claims that she suffered this treatment at least partly because of her race, and because of her status as a breast cancer survivor.  (Doc. 31-2, p. 30).  This lack of precision as to which of her conditions led to her treatment is revealing of a fundamental flaw with Plaintiff's attempt to use these allegations to show Defendant's general racial animus – she can point to no evidence that any of her treatment, much less the termination she attempts to use it to contest, was due to her race.  Rather, her allegations of racial discrimination are based solely on the fact that she was the only African-American ISR at the store at the time she was hired, and otherwise on her own perception and conjecture.

Regarding the former, Plaintiff was the only African-American ISR at the time of her hiring.  However, the store also had another African-American employee, an Inventory Associate who handled the store's cash and equipment, and presently three of the store's fifteen ISRs are African-American.  Moreover, Luneau had other African-American employees in the past, and there is no evidence that any of them suffered ill-treatment.  Finally, as stated, Plaintiff presents no evidence

-20-

that she was replaced by someone of a different race, or that other individuals of a different race who were similarly situated to her in having missed so much work so soon after being hired were ever treated better than she. Accordingly, we find no basis in the law for holding that this fact alone supports a finding that this alleged disparate treatment shows racial animus, or otherwise suffices to rebut Defendant's proffered explanation for Plaintiff's firing.

Regarding the latter, Plaintiff avers that she experienced much of the above treatment as racial animus, but as demonstrated by her imprecision, she also experienced the treatment as motivated by her status as a breast cancer survivor, and as generally unfair due to the illness she was suffering at the time. For example, in her deposition she was asked, "with respect to your termination, do you think that was because of your race?" Plaintiff responded "Not only my race, but I felt like I was unjustified – the termination was unjustified because I did have excused absences." (Doc. 31-2, p. 57). Similarly, regarding her claim that she received less training than did her Caucasian co-workers, she was asked, "the reason . . . you believe that you were not trained properly . . . [w]hat makes you think it was because of your race?" (Doc. 31-2, pp. 57-58). She replied:

> Because I noticed every day, and I dealt with it every day how they would do with the white co-workers and how I was stuck off to the side. There was lack of communication. My things were being misplaced. The being left out from having – other co-workers and new hires had a code to the store when I wasn't.

(Doc. 31-2, p. 58). Finally, in discussing whether Luneau had ever displayed any signs of racial animus toward her, she had the following exchange:

> Q: Did [Luneau] ever say anything that was – had some sort of racial connotation to it?
> A: It was a very nonchalant type of demeanor she had.
> Q: Did she ever use any words that were racially derogatory?

-21-

A: In that particular time, no.
Q: Any time?
A: Not that I can recall.

(Doc. 31-2, pp. 61-62).

It is a factual dispute whether the allegations of the disparate treatment themselves are true. As Plaintiff's answer indicates, however, there is no reason in the alleged disparate treatment itself to conclude that it was due to Defendant's racial animus, much less that it shows such animus so as to refute Defendant's proffered explanation for terminating Plaintiff's employment.

Plaintiff is correct that the Supreme Court's decision in *Reeves* relaxed the Fifth Circuit's interpretation of the *McDonnell Douglas* test so that once a Plaintiff has proven her prima facie case – which we do not find Plaintiff did here – she can satisfy her burden of showing pretext with only "sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision." 530 U.S. at 140. Likewise, she is correct that this evidence can include prior instances of racial animus. These prior incidences, however, must themselves show such racial animus. Where there is no evidence of racial animus in the treatment itself and instead Plaintiff's claim of animus – for both her termination and her prior treatment – is based solely on her own personal conjecture, then these prior instances alone cannot be deemed sufficient for a reasonable factfinder to reject the employer's proffered reasons for this treatment, much less its explanation of an otherwise apparently unrelated termination decision.

*4. Independent evidence that her absences were the actual reason for her termination exists*

Finally, we note that not only is there no evidence in the Record to support Plaintiff's claim of racial animus, there is direct evidence in the Record contradicting it. Specifically, after her termination, Plaintiff sent the following email to Mr. Phil Mayberry, a senior Centennial executive,

-22-

asking that Centennial reverse its termination decision:

> Mr. Mayberry first I want to share the fact that I am a breast cancer survivor of three years pulling my life back together. Angela Luneau was also informed of this during my interview process. I was hired and began to work. Things started off horrible because there was no assistance in training from my co-workers nor my supervisor, Angela Luneau therefore; I learned as much as I could on my own until the aid of "Foundation" and COSP training. After that things began to fly much smoother up until this point. Mr. Mayberry I was rushed to the emergency room on October 27, 2007 with a life threatening situation which lead me to surgery on 11/09/2007 . . . From the date of 10/27/07 to 11/12/2007, I was medically off duty due the <u>medical emergency</u>. I returned to work on 11/13/2007, which was earlier than the doctors stated I should return but, I went ahead anyway. Well Mr. Mayberry on 11/25/07 I was back in the hospital, this time and infection I have picked up following the surgery. On 11/27/2007 I suffered allergic reactions due the medication the doctor prescribed and was back at hospital again today. Well, after leaving the hospital again today Mr. Phil I called Angela to let her know I am able to come back to work on tomorrow and what was my schedule ..... she told me that I was terminated due unexcused absences. Mr. Mayberry, health issues are most of the time, unannounced, no one plans to be suddenly ill. My medical documents were ALL given to Angela upon my returning to work except those for the past few day(s) which I do have available, upon request.

> Mr. Mayberry, my reason for bringing this to you is .... I disagree with the termination of my position with Centennial. Someone's health is not a valid reason to terminate one especially here at Christmas. . . .

(Doc. 17-5, p. 30; Doc 31-4, p. 76) (quoted as written).

This email refutes Plaintiff's claim in two ways. For one, it shows a lack of connection between her earlier poor treatment and her subsequent termination. She says that she had some difficulties, particularly in receiving training, early in her tenure, but that she considered the problems resolved and that they otherwise were not a factor when the final set of absences that ultimately led to her termination began.

Second, this email indicates that Plaintiff's termination was not – even to her initially – about her race, or even her status as a breast cancer survivor, but what she perceived as the unfairness of

being fired for a prolonged hospital stay due to a medical condition. As discussed, she may be right; we do not judge whether her employer's action was fair, only that it was not illegal. Further, this email is consistent with Defendant's deposition testimony, that she thought her firing was unjustified because she had excuses for her absences, not, at least solely, because it was due to her race.

In all, while we make no credibility determinations, in assessing the evidence in the record as to whether there is a disputed issue of material fact, we note that Plaintiff presents no evidence supporting her claim, that would show that Defendant's nondiscriminatory explanation for its decision is pretextual or false, while significant evidence, emanating from Plaintiff herself, exists supporting that explanation. Accordingly, and also considering the same-hirer same-firer presumption, we do not find that Plaintiff's allegations succeed in raising a genuine issue of material fact regarding Defendant's actual reason for her termination.

### Conclusion

For all of the reasons given above, and based on our thorough review of the Record, we conclude that under the burden-shifting framework of *McDonnell Douglas* Plaintiff's Title VII claim should be dismissed. We do not find that Plaintiff carries her burden of making a prima facie case, as Plaintiff points to no evidence of disparate treatment between herself and another employee similar situated, nor to any showing that she was replaced by a non-African American. Second, Defendant has a sound non-discriminatory reason for terminating Plaintiff, her excessive absences. Third, there is no evidence that this decision was pretextual, including in Defendant's official employment policy. Finally, though Plaintiff can show no relationship between her earlier treatment and the termination decision, and indeed her own evidence indicates that her termination was motivated by the reason given by Defendant, we thoroughly reviewed all of Plaintiff's other

allegations regarding discrimination she allegedly suffered during her employment tenure and found them insufficient of showing a reasonable factfinder that Defendant's proffered explanation for its decision is false or unworthy of credence.  And, to the extent that her allegations could create such a question of fact – and we find they cannot – the same-hirer same-firer presumption would resolve it here in favor of Defendant as a matter of law.

For all of these reasons, in a separate judgment also issued this date, we order that Defendant's motion for summary judgment (Doc. 27) be GRANTED and Plaintiff's claims DISMISSED, with prejudice.

SIGNED on this 31st day of March 2011 at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE